UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIE DANSBY,

        Petitioner,

v.                                 CASE NO. 06-12395
                                   HONORABLE GEORGE CARAM STEEH

JAN TROMBLEY,

        Respondent.
_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

Petitioner Willie Dansby has filed an application for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for second-degree murder, assault with intent to commit murder, and possession of a firearm during the commission of a felony (felony firearm). Respondent urges the Court to deny the habeas petition. The Court agrees that Petitioner's claims do not warrant granting the writ of habeas corpus. Therefore, the habeas petition will be denied.

**I. The Facts and Procedural History**

Petitioner was charged in Wayne County, Michigan with first-degree (premeditated) murder, assault with intent to commit murder, and felony firearm. The convictions arose from allegations that Petitioner fired a gun at Clarence Perkins and Frederick ("Rick") Ivery when Perkins, Ivery, and Paul Cobb went to Petitioner's home to collect money owed to them for remodeling Petitioner's kitchen. Perkins died from injuries sustained in the shooting, but neither Ivery, nor Cobb, were harmed.

Police Officer Joseph Bialy testified that he responded to the crime scene at 11:20 a.m.

on April 18, 2003. He observed a man lying on the ground. The man was still conscious, and when Officer Bialy asked him what had happened, the man replied, "The guy that lives in the house shot me." Dr. Cheryl Loewe testified that Clarence Perkins died from a single gunshot wound to his chest and that the manner of death was homicide.

Rick Ivery testified that he, Clarence Perkins, and Paul Cobb remodeled Petitioner's kitchen for a fee of $4,000. As of April 18, 2003, Petitioner still owed the men several hundred dollars for the remodeling job. At about 9:00 a.m. that morning, the three men knocked on Petitioner's door. Because no one answered, they left the house and shopped at Home Depot for a while. Ivery subsequently received a message from Petitioner. When he returned Petitioner's telephone call, Petitioner asked him what he did to his lights. Ivery responded, "What do you mean?" Petitioner then instructed Ivery to come back and pick up his money. Ivery, Perkins, and Cobb returned to Petitioner's home. Ivery and Perkins were in one vehicle, and Cobb was in a different vehicle. At Petitioner's house, Perkins got out of his truck, stepped onto Petitioner's porch, and opened the armor guard door. Ivery got out of the same truck and stood on the ground to the left of Perkins. He heard Perkins say to Petitioner, "It ain't like that, is it player." Petitioner responded, "Yeah." Ivery then heard a gun being chambered and a gunshot. Perkins fell back onto the porch, and Ivery took off running while gunshots were fired at him. Ivery kept running until Cobb picked him up. They saw Petitioner exit his house and get in a vehicle, but Petitioner went in the opposite direction of them. Ivery and Cobb returned to Petitioner's house where they saw Perkins lying on the ground with a hole in his chest.

Ivery denied having a weapon on him that day, and he testified that he did not see a weapon on Perkins or Cobb. He also testified that neither he nor Perkins approached Petitioner

2

in a threatening manner and that there had not been any arguments or problems with Petitioner's late payments for the remodeling job. He denied kicking on Petitioner's door, and he denied hearing any glass break when Clarence Perkins walked toward the back of the house.

Paul Cobb corroborated much of Rick Ivery's testimony. Cobb also denied banging on Petitioner's door or breaking Petitioner's windows. He testified that, after the three men returned to Petitioner's house a second time on April 18, 2003, he heard a gunshot coming from Petitioner's house as he was parking his truck. He did not see Petitioner shoot Perkins, but he did see Petitioner standing on the porch shooting at Rick Ivery, who was running toward the neighbor's house.

Evidence technician Lori Briggs testified that she found nine millimeter casings in Petitioner's front yard and on his porch. The parties stipulated that all the casings were fired from the same weapon.

Petitioner's wife testified for the defense that she and her husband operated a foster care home. On the morning of April 18, 2003, she and Petitioner went to the Humane Society to acquire a dog for the children. When they returned, the lights were off, and the children informed them that Rick and some men had come over to the house, beat on the doors, disconnected the power, and threatened to harm Petitioner. Petitioner then told her that he had to "make a run." She was upstairs when she heard gunshots. She did not hear an argument before the gunshots, and she did not see Petitioner before or after the shooting. She also was not aware of any threats to the children.

Damon Lee, aged 14, testified that he and his cousin Brittany lived with Petitioner and Petitioner's wife. On April 18, 2003, he and Brittany heard someone cursing, banging on the

3

door, and saying, "We know you're in there." The people also cut off their power. He and Brittany hid upstairs in their rooms because they were frightened. When Petitioner and their foster mother came home, he informed them what had happened and he stated that he could identify the men. The only person he could identify by name was Rick, who had worked on their house. Although he heard gunshots while he was upstairs, he did not know where Petitioner was at the time.

Brittany Dunbar's testimony was similar to Damon Lee's testimony. Petitioner testified that, when he returned home from the Humane Society on April 18, 2003, the children informed him that Rick and some men had been over to the house and were beating on the house, cutting off the power, cursing, and threatening to harm him. He later saw the men arrive at his house in two vehicles. He ran upstairs, grabbed his gun, and put it in his pocket, although he did not anticipate shooting anyone. Then he went back downstairs.

Perkins opened the door and was on his way into the house when he (Petitioner) stopped Perkins and asked him why they had been over there beating on his house, breaking his windows, and shutting off his power. Rick Ivery was standing directly behind Perkins and demanded Petitioner's money. Petitioner refused to pay the men. Ivery then pulled out a gun, which looked like a revolver, and said, "Where is my money?" Petitioner responded, "Hold on. It's not like that." Ivery told Perkins to "get him." As Perkins entered the house, Petitioner pulled out his gun, closed his eyes, and fired. When he opened his eyes, he saw that Perkins had fallen. After he went outside to check on Perkins, he heard a noise and saw that Rick Ivery was standing in the driveway shooting at him. He turned and fired back at Ivery. About twelve hours after the incident, he turned himself in to the police and made several statements while he

4

was in a state of shock. He did not remember what he told the police.

Petitioner claimed that, prior to April 18, 2003, he had not had any disagreement with Rick Ivery and Ivery's work crew and that they had gotten along quite well. He denied having a plan, reason, or motive to shoot anybody. He also denied asking Rick Ivery to come and get his money. He claimed that he had thought the men were going to kill him and his family, and he stated that he wanted the jury to believe he had been protecting himself and his family.

Two police investigators testified on rebuttal that they took statements from Petitioner. Investigator Barbara Higgins testified that she advised Petitioner of his constitutional rights at 1:25 a.m. on April 19 and that he did not appear to be in shock at the time. Investigator Tawnya King testified that she spoke with Petitioner on the same day at 11:55 a.m. and that Petitioner had said he wanted a lawyer when she asked him whether he called Rick on his cell phone and told him to come and get his money.

On July 29, 2003, a circuit court jury found Petitioner guilty of the lesser offense of second-degree murder, MICH. COMP. LAWS § 750.317, as well as, assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and felony firearm, MICH. COMP. LAWS § 750.227b. The trial court initially sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent terms of fifteen to twenty-five years for the murder conviction and ten and a half to seventeen years for the assault conviction. Within minutes of sentencing Petitioner, the court realized that it had made a mistake and recalled the parties. The court then re-sentenced Petitioner on the murder count to a term of twenty-five to fifty years.

The Michigan Court of Appeals affirmed Petitioner's convictions and sentence in an unpublished *per curiam* opinion. *See People v. Dansby*, No. 251732, (Mich. Ct. App. Feb. 17,

5

2005). On September 15, 2005, the Michigan Supreme Court denied leave to appeal, but remanded the case to the trial court "for correction of the judgment of sentence consistent with the initially imposed sentence." *See People v. Dansby*, 474 Mich. 861; 703 N.W.2d 188 (2005) (table).

Petitioner filed his habeas corpus petition through counsel on May 26, 2006. His claims are:

> I. Defendant was entitled to a jury instruction on the lesser offenses of voluntary and/or involuntary manslaughter, as those lesser included offenses are degrees of the law of criminal homicide that are inferior to the charged offense under MCL 768.32(1), where the evidence at trial would have permitted a rational jury to find that only the lesser offense and not the charged offense was committed.
>
> II. The admission of evidence regarding defendant Dansby's post-arrest statements, including his refusal to answer a question and his request for an attorney, violated his rights against self-incrimination and due process.
>
> III. Defendant Dansby's trial counsel rendered constitutionally ineffective assistance of counsel in failing to object to testimony that Mr. Dansby had made no comment and asked for an attorney when questioned by police at the time of his arrest.

Respondent asserts in an answer to the habeas petition that Petitioner's claims are procedurally defaulted, not cognizable on habeas review, or without merit.

## II. Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. Section "2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted).

### III. Discussion

#### A. The Jury Instructions

Petitioner alleges that he was entitled to a jury instruction on voluntary or involuntary manslaughter as a lesser-included offense to murder. He argues that, under state law, both forms of manslaughter are inferior offenses of murder and that the evidence at trial would have

supported a manslaughter verdict. Petitioner maintains that the trial court's refusal to instruct on manslaughter violated his due process right to a properly instructed jury on all essential elements of the offense.

### 1. Voluntary Manslaughter

Petitioner alleges that a jury instruction on voluntary manslaughter would have been appropriate because the jury could have concluded that the victims provoked him to the point of distorting his thinking. The Michigan Court of Appeals concluded that the evidence did not support an instruction on voluntary manslaughter and that the trial court did not abuse its discretion in failing to give the instruction.

The fact that the jury instructions may have been "incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Furthermore, the United States Supreme Court has not decided whether due process requires the giving of jury instructions on lesser-included offenses in non-capital cases. *See Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980). The United States Court of Appeals for the Sixth Circuit therefore has concluded that "the Constitution does not require a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (*en banc*)). "[F]ailure to instruct on a lesser included offense in a noncapital case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (quoting *Bagby*, 894 F.2d at 797).

Even if Petitioner's claim were cognizable on habeas review, a defendant generally is entitled to a jury instruction on a recognized defense only if sufficient evidence exists for a

8

reasonable jury to find in his favor. *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citing *Stevenson v. United States*, 162 U.S. 313 (1896)). "[D]ue process does not require an instruction on a lesser-included offense if the evidence does not support such an instruction." *Bowling v. Parker*, 344 F.3d 487, 500 (6th Cir. 2003) (citing *Hopper v. Evans*, 456 U.S. 605, 611 (1982)).

In Michigan, voluntary and involuntary manslaughter are necessarily lesser-included offenses of murder, and an instruction on both offenses must be given if a rational view of the evidence supports the instruction. *People v. Mendoza*, 468 Mich. 527, 541; 664 N.W.2d 685, 693 (2003).[1]

> [M]urder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. However, the element distinguishing murder from manslaughter - malice - is negated by the presence of provocation and heat of passion.

*Id.*, 468 Mich. at 540; 664 N.W.2d at 692 (internal citation omitted). The provocation necessary to mitigate a homicide from murder to manslaughter must be "adequate," that is, something which would cause a reasonable person to lose control or to act out of passion rather than reason. *People v. Sullivan*, 231 Mich. App. 510, 518; 586 N.W.2d 578, 582 (1998). Additionally, "there cannot be a lapse of time during which a reasonable person could control his passions." *Id.*

There was insufficient evidence of provocation in this case to reduce the crime to manslaughter. Petitioner allegedly called Rick Ivery and instructed Ivery to come and get his money. When Ivery, Clarence Perkins, and Paul Cobb returned to Petitioner's home, Petitioner went upstairs, armed himself, and then went back downstairs to confront the men. He claimed

---

[1] "A necessarily lesser included offense is an offense whose elements are completely subsumed in the greater offense." *Mendoza*, 468 Mich. at 540; 664 N.W.2d at 692.

9

that he got his gun because the men exited their vehicle in an aggressive manner and he wanted to protect himself and his family. However, he maintained that he was not angry when he learned that Perkins, Ivery, and Cobb had been to his home earlier in the day, and he described himself as more leery or upset than angry. He defined "angry" as "flat out mad," blowing a fuse, and "you just ready." He defined "upset" as being upset about something and "you like why." (Tr. July 28, 2003, at 34-35.) Even if Petitioner honestly thought that Perkins, Ivery, and Cobb had damaged his home and frightened his foster children while he was away, such conduct was not adequate to provoke a person to shoot someone. Moreover, there was a sufficient amount of time between learning about the alleged damage and the subsequent confrontation for Petitioner's passions to cool.

There was insufficient evidence for a reasonable juror to find Petitioner guilty of manslaughter. Therefore, Petitioner's right to due process was not violated by the lack of a jury instruction on voluntary manslaughter.

### 2. Involuntary Manslaughter

Respondent contends that Petitioner's claim about involuntary manslaughter is procedurally defaulted. A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The state procedural rule in question here is Michigan's contemporaneous-objection rule, which requires defendants to make timely and specific objections at trial in order to preserve their claims for appellate review. *See People v. Carines*, 460 Mich. 750, 764-65; 597 N.W.2d 130, 138-39 (1999); *People v. Grant*, 445 Mich. 535, 546; 520 N.W.2d 123, 128 (1994). Instructional errors, in particular, should not be considered on appeal unless the issue has been preserved by an objection in the trial court. *People v. Handley,* 415 Mich. 356, 360; 329 N.W.2d 710, 712 (1982).

Defense counsel requested a jury instruction on manslaughter without specifying whether he wanted an instruction on voluntary manslaughter or involuntary manslaughter or both. However, it is clear from his argument before the trial court that he was requesting an instruction on voluntary manslaughter.[2] Because Petitioner did not request an instruction on involuntary manslaughter, nor object to the absence of a jury instruction on involuntary manslaughter, the Michigan Court of Appeals reviewed Petitioner's claim for "plain error" affecting substantial rights.

The state appellate court's review for "plain error" constitutes enforcement of a procedural default. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). Reliance on the contemporaneous-objection rule was an adequate and independent basis for the state court's conclusion because the rule was firmly established by the time of Petitioner's trial in 2003. Consequently, Petitioner must show "cause and prejudice" or a "miscarriage of justice" for this Court to consider the substantive merits of his claim. *Coleman v. Thompson*, 501 U.S. at 750. He has not offered any argument in support of a finding of "cause and prejudice." The Court

---

[2] He stated that Petitioner "was energized by hot blood." (Tr. July 28, 2003, at 55-56.)

11

therefore deems the "cause and prejudice" argument abandoned. *Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003).

The remaining question is whether a miscarriage of justice will occur from the Court's failure to adjudicate the substantive merits of Petitioner's claim. The narrow exception for fundamental miscarriages of justice requires a habeas petitioner to demonstrate that the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). "To be credible, such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327.

Petitioner has not presented any new evidence to support a claim of actual innocence. Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider his claim about the lack of a jury instruction on involuntary manslaughter. That claim is procedurally defaulted.

### B. Petitioner's Post-Arrest Statements

Investigator Tawnya King testified as a rebuttal witness. She explained on direct examination by the prosecutor that she interviewed Petitioner on April 19, 2003. Investigator King went on to say that Petitioner had been advised of his constitutional rights and that the interview terminated when Petitioner stated that he wanted his lawyer. Petitioner alleges that

this testimony violated his constitutional right to due process and his right not to incriminate himself. The Michigan Court of Appeals rejected Petitioner's claim because, in its opinion, there was no reasonable likelihood that the evidence affected the outcome of the trial.[3]

### 1. Legal Framework and Application

The Fifth Amendment to the United States Constitution protects an accused from being compelled in a criminal case to be a witness against himself. U.S. CONST. amend. V. As a result, an individual who is taken into custody must be informed that he has the right to remain silent, that anything he says can be used against him, that he has the right to the presence of an attorney, and that an attorney will be appointed for him if he cannot afford one. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). While these warnings "contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Thus, it is "fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id*.

At issue here was the prosecutor's questions to Investigator King about the manner in

---

[3] Respondent asserts that Petitioner's claim is procedurally defaulted because Petitioner failed to (1) make a contemporaneous objection to the prosecutor's initial questions to Investigator King and (2) assert a specific objection to the prosecutor's subsequent questions to Investigator King on redirect examination. The Supreme Court has held that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quotation marks omitted). The Michigan Court of Appeals was the last state court to render a reasoned opinion in Petitioner's case. While the court of appeals did say that Petitioner's claim involved both preserved and unpreserved errors, the court did not explain which error was unpreserved. Because the state court of appeals did not clearly rely on a procedural error to deny relief, this Court will not treat Petitioner's claim as procedurally defaulted.

which her interview with Petitioner terminated. Investigator King explained that she had asked Petitioner whether he called Rick Ivery on his cell phone and told him to come and get his money. According to Investigator King, Petitioner answered, "No, I want my lawyer." This testimony was improper, because "a defendant's actual statement asserting his *Miranda* rights . . . is not admissible as substantive evidence of the defendant's guilt." *United States v. Andujar-Basco*, 488 F.3d 549, 555 (1st Cir. 2007). "[S]ilence does not mean only muteness; it includes the statement of a desire to remain silent as well as of a desire to remain silent until an attorney has been consulted." *Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13 (1986).

Respondent points out that Petitioner initially waived his right to remain silent by speaking with Investigator King. Although "a line of Eighth Circuit cases . . . hold that testimony regarding a defendant's refusal to speak to the police, following an initial *Miranda* waiver, is admissible against the defendant," this Court agrees with the First Circuit that "the Fifth Amendment bars testimony concerning a defendant's explicit mid-interrogation assertion of his *Miranda* rights . . . ." *Andujar-Basco*, 488 F.3d at 555 and 557. "[N]either *Miranda*, nor any subsequent Supreme Court decision, draws a distinction between an immediate post-arrest Fifth Amendment assertion and a delayed mid-interrogation assertion." *Id*. at 556. In fact, the Supreme Court expressly stated in *Miranda* that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." *Miranda*, 384 U.S. at 468 n.37. Thus, the prosecutor violated Petitioner's constitutional right not to incriminate himself when he elicited testimony that Petitioner invoked his constitutional rights during his interview with Investigator King.

14

## 2. Harmless Error

*Doyle* errors are harmless unless they had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Petitioner contends that the constitutional error was not harmless because the jury could have concluded that a person who acted in self defense would not have requested an attorney or hesitated to answer Investigator King's questions. The jurors, however, could have concluded just as easily that Petitioner simply decided it would be wise to consult an attorney rather than try to answer the questions of an experienced interviewer, who might not be inclined to believe him. "Silence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle*, 426 at 617.

Investigator King, moreover, testified that there was nothing improper or wrong in Petitioner asking to see a lawyer and that, in fact, it was his right to consult an attorney. (Tr. July 28, 2003, at 70.) She further testified that, while it may have been convenient for Petitioner to ask for a lawyer, it was not strange. *Id.* at 73.

The Court also notes that defense counsel invited the error[4] when he asked Petitioner at a previous point in the trial whether, at the end of his statement to the police, he told the officer that he wished to see a lawyer. Petitioner answered in the affirmative. (Tr. July 28, 2003, at 42.)

---

[4] "The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991) (citing 5 Am. Jur.2d § 713 (1962)).

The prosecutor's subsequent question directed at Investigator King and Investigator King's response that Petitioner invoked his constitutional rights were harmless errors because Petitioner previously admitted that he told the police he wished to see a lawyer. *See United States v. Tarwater*, 308 F.3d 494, 512 (6th Cir. 2002) (stating that, to the extent the prosecutor improperly commented on the defendant's failure to discuss to discuss any tax matters with revenue agents, the comments were harmless because the defendant himself admitted in evidence an exhibit which twice stated that the defendant declined to discuss tax matters with the revenue agent). Furthermore, the prosecutor did not raise the issue in his closing argument, nor argue that Petitioner must be guilty because he invoked his right to counsel.

Finally, the evidence against Petitioner was overwhelming. His identity as the shooter was not challenged. The only issue was whether he fired in self defense. While he claimed that Rick Ivery possessed a gun, Ivery and Paul Cobb testified that neither they, nor Clarence Perkins, were armed.

Petitioner's claim of self-defense was weak for several other reasons. First, Petitioner's wife and children were upstairs at the time that he claimed to be defending them, and he himself apparently went downstairs to confront Perkins, Ivery, and Cobb at the front door of the house.

Second, Petitioner testified that he closed his eyes and fired at Clarence Perkins, who was unarmed. Then he allegedly ran onto the porch to check on Perkins' condition even though he claimed that Rick Ivery had been standing behind Perkins and was armed with a gun.

Third, Petitioner apparently threw away his gun and did not call the police to report the incident despite the fact that he supposedly acted in self defense. After the shooting, he left his wife and two foster children to fend for themselves although he testified that he had been

protecting them and that Ivery was armed. He subsequently called his mother and spoke with his uncle, not his wife or children, and turned himself in to the police about twelve hours later. At the police station, he failed to inform the police that Ivery had fired a gun at him. Finally, there was no physical evidence to support Petitioner's allegation that Perkins, Ivery, and Cobb had kicked his door, damaged his windows, or tampered with his lights.

In conclusion, evidence that Petitioner invoked his constitutional rights when questioned by the police could not have had a substantial and injurious effect or influence on the jury's verdict. Although credibility was an issue, this is not a case where the facts by themselves did not affirmatively prove the defendant's guilt or innocence. *Cf. Gravley v. Mills*, 87 F.3d 779, 790 (6th Cir. 1996) (concluding that the *Doyle* error was not harmless where the facts by themselves did not affirmatively prove the petitioner's guilt or innocence, the petitioner's credibility or lack of credibility was the dominant factor behind his conviction, and the jury was reminded over and over again that the petitioner would have come forward earlier if his version of the events were really true). The constitutional error was harmless.

### C. Trial Counsel

The third and final claim alleges that defense counsel was ineffective for failing to object to testimony that Petitioner asked for an attorney when Investigator King questioned him. The Michigan Court of Appeals adjudicated this claim on the merits and concluded that, even if defense counsel's strategy was unreasonable, Petitioner had failed to show that, but for counsel's error, the result of the trial would have been different.

To prevail on a claim of ineffective assistance, a habeas petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the

defense. *Strickland v. Washington*, 466 U.S. 668 , 687 (1984). An attorney's performance is deficient if "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

A deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. The defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id*. at 700.

Defense counsel made a half-hearted objection when the prosecutor asked Investigator Tawnya King whether she found it peculiar that Petitioner asked for a lawyer.[5] However, defense counsel did not object to the prosecutor's earlier question about who terminated the interview with Investigator King, and it was defense counsel who first brought up the topic on re-direct examination of Petitioner. Counsel's failure to make a specific and timely objection and his tactic of eliciting testimony from Petitioner that he had asked to see a lawyer arguably amounted to deficient performance. *See Combs v. Coyle*, 205 F.3d 269, 286 (6th Cir. 2000) (concluding that defense counsel's failure to object to evidence that the defendant told an officer to "talk to [his] lawyer" clearly fell below an objective standard of reasonableness). Defense counsel may have reasoned, as a matter of trial strategy, that it was less harmful to elicit the

---

[5] Defense counsel objected to this question by saying, "I don't know, judge. That's kind of like on the verge of being objectionable." (Tr. July 28, 2003, at 72-73.)

testimony from Petitioner than to have the prosecutor use the evidence to impeach Petitioner on cross-examination. However, the prosecutor could not have impeached Petitioner with his silence, because prosecutors may not comment on a defendant's post-arrest silence in their case in chief or on cross-examination. *Tarwater*, 308 F.3d at 511.

Nevertheless, as noted above, Investigator King testified that there was nothing improper or strange about Petitioner asking to see a lawyer and that he had a right to do so. Furthermore, the prosecutor did not argue that Petitioner must be guilty because he invoked his right to counsel, and the evidence against Petitioner was overwhelming.

The Court's confidence in the outcome of the trial is not undermined by defense counsel's deficient performance, for there is not a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The Court therefore agrees with the state court that Petitioner has failed to prove he was prejudiced from his attorney's deficient performance. His claim lacks merit because he has failed to establish both prongs of the *Strickland* test.

## IV. Conclusion

The state court's adjudication of Petitioner's claims did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, the petition for writ of habeas corpus is DENIED.

Dated: June 30, 2008

                                                          S/George Caram Steeh
                                                          GEORGE CARAM STEEH
                                                          UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 30, 2008, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk